UNITED STATES of America, Plaintiff,

v.

EASTMAN KODAK COMPANY,
Defendant.

UNITED STATES of America, Petitioner,

v.

EASTMAN KODAK COMPANY, a Corporation of New Jersey, and Eastman Kodak Company, a Corporation of New York, and Others, Defendants.

No. 93–MC–45.

United States District Court,
W.D. New York.

May 20, 1994.

Sanford M. Adler, Nora W. Terres, U.S. Dept. of Justice, Antitrust Div., Washington, DC, for plaintiff U.S.

David M. Lascell, Hallenbeck, Lascell & Pineo, Rochester, NY, for defendant Eastman Kodak Co.

TELESCA, Chief Judge.

Pending before this Court are motions brought by Eastman Kodak Company ("Kodak") for modification or termination of two antitrust consent decrees entered into in 1921 (Civil Action No. A–51) and in 1954 (Civil Action No. 6450), respectively. Also pending is Kodak's motion filed before trial for summary adjudication of the legal standard to be applied in a proceeding for modification of an antitrust decree.

## INTRODUCTION

Events during the historical growth of the photographic industry spanning almost a century provide the basis for two antitrust consent decrees. These decrees were intended to remedy Kodak's dominance in the market-

ing of film and in photofinishing by prohibiting Kodak from participating in the private label film market and from selling film with photo processing costs included. Kodak claims that it has complied with all of the requirements of the 1921 decree decades ago and the continuing prohibition to sell private label film is unfair because of drastic changes in market conditions and competition. Also, the main purpose of the 1954 decree, which was to end Kodak's technological advantage in color film processing and create a market where there had been none, has been totally achieved and, therefore, its restrictions should be terminated. Kodak argues that the restraints imposed by both decrees are obsolete because of drastic changes in the photographic industry and the global economy, that now provide marketing opportunities to others which are denied to Kodak. Kodak also argues that its dominance in the photographic industry has long since ended and the restraints of both the 1921 decree and the 1954 decree prevent the marketing of newly developed technical improvements and adaptations in the photographic industry.

Therefore, the central issue presented is whether the change of circumstances since 1921 and 1954 warrant either modification or termination of both decrees. The Government, voicing the arguments of various competitors in the photographic industry, objects to any major modification of either decree. The consistent theme of that objection is that, notwithstanding an increased competitive atmosphere in the photographic industry, Kodak's dominance is still directly related to the economic advantage it gained prior to the enactment of both decrees and, therefore, the restraints of both decrees should remain in place. To accept that argument would require me to ignore critical historical changes of the past 73 years, both economic and legal. For the reasons set forth herein, I hold that dramatic changes have taken place in the development of the photographic industry, the global economy and in legal precedent which warrant termination of both the 1921 and 1954 decrees.

## BACKGROUND

On August 24, 1915, the Honorable John R. Hazel, a member of this Court, issued a decision after an extensive trial, which produced more than 3,000 printed pages of testimony and three volumes of exhibits. That decision found that George Eastman and the Eastman Kodak Company had monopolized the amateur photography industry between 1895 and 1910. *United States v. Eastman Kodak Co.,* 226 F. 62 (W.D.N.Y.1915) *appeal dismissed,* 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795 (1921). Judge Hazel described the history of the industry and the conduct which he found had violated the antitrust laws. Certain aspects of those findings require restatement.

### 1. Eastman's Early Innovations

In 1878, George Eastman entered the field of photography by selling collodion plates, commonly known as wet plates, which were used to make photographic negatives. Soon afterward in 1881, he organized the Eastman Dry Plate Company and began producing dry plates, a process which involved suspending photosensitive silver halides in gelatin and applying the suspension to a glass plate. While continuing to produce dry plates, Eastman researched more manageable and inexpensive media to support the photosensitive emulsions.

In 1884 and 1885, Eastman and a partner, William H. Walker, completed research into, and were granted patents for, a system which used a roll of paper to support the photosensitive emulsions and a mechanism to hold that roll within the camera. Although Eastman hoped that this system would gain immediate public acceptance, it was not until 1888 when Eastman produced a camera—the "Kodak"—which was commercially successful.

Although the Kodak camera finally brought photography into the amateur realm, the paper roll was difficult to process, because the paper needed to be detached from the back of the photographic emulsion before the positive image could be transferred to photographic paper. Eastman attempted to produce a transparent negative film that required neither glass nor paper to support the emulsions. Eastman originated the first commercially successful nitrocellulose roll

film system by borrowing from and refining the ideas of Rev. Hannibal Goodwin. Eastman and one of his employees, Henry Reichenbach, received patents for this system in 1892. The implementation of celluloid roll film was a major advance in the film industry because it simplified the use of the camera, made processing easier, and finally made photography fully accessible to the general public. The amateur photographic industry was born.

### 2. Eastman Kodak's Antitrust Violations

Eastman's success with the roll film camera and the general public's increasing demand for the product inevitably brought competition. In the 1890s, competitors began to produce cameras implementing refinements to the film and the camera apparatus developed by Eastman. In addition to improving its cameras and films, Eastman Kodak also worked to enhance the marketing of its products, making them more available to consumers by encouraging drug stores to carry them as a side line. Innovative refinements and increased competition resulted in lowered prices which brought new consumers into the amateur photography market.

Kodak then began to acquire its camera and film competitors. The Boston Camera Company was acquired in 1895, the American Camera Manufacturing Company in 1898, and the Blair Camera Company in 1899. In his decision of 1915, Judge Hazel found nothing unlawful in the acquisitions of these three companies, although he found that they were the "nucleus from which arose the intention to bring other companies manufacturing and dealing in photographic supplies under its control." 226 F. at 70.

At approximately the same time, Kodak began to purchase photographic paper suppliers. Kodak purchased at least nine paper companies between 1894 and 1898, and consolidated most of these companies into the General Aristo Company, which remained a subsidiary of Kodak.

Far more significant in Judge Hazel's decision, however, was the 1898 agreement between Kodak and the General Paper Company of Brussels (which was, at the time, the principal supplier of raw stock for photography paper for the entire world) that, in essence, gave Kodak control of all paper imported into the United States by the General Paper Company. Ultimately and by 1908, Kodak quickly came to control the raw paper industry in the United States.

Kodak also purchased and consolidated several dry plate manufacturers, stock houses engaged in selling photographic supplies, and plate camera manufacturers between 1890 and 1905. Judge Hazel found that these acquisitions were made with the intent to monopolize. Based upon this finding, Judge Hazel ordered that an antitrust decree be entered remedying Kodak's violation of the antitrust laws.

### 3. The 1921 Decree

Judge Hazel considered all available remedies under the antitrust laws and decided that the relief should forbid future violations of the antitrust laws and also abrogate the illegal monopoly which he had found that Kodak had acquired. Judge Hazel entered a final decree on January 20, 1916, which Kodak thereafter appealed to the Supreme Court. In 1921, Kodak withdrew its appeal and agreed with the Government on the terms of the consent decree which ultimately was issued by Judge Hazel on February 1, 1921 ("the 1921 decree").

The decree, as drawn, had two essential functions. The first function, which has been satisfied, was short-term relief. Kodak was ordered to sell portions of businesses that it had acquired between 1890 and 1910. These terms of the 1921 decree were satisfied decades ago, and subsequent amendments to the decree reflect Kodak's full compliance.

The 1921 decree also placed artificial restraints on Kodak's participation in the market in order to "effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about." *United States v. Eastman Kodak Co.*, 226 F. at 81 (quoting *Standard Oil Co. v. United States*, 221 U.S. 1, 78, 31 S.Ct. 502,

523, 55 L.Ed. 619 (1911)). Most prominent among these provisions is Section X, which prohibits Kodak from selling "so-called fighting brands" and requires that all articles and supplies shall "be labeled in such a manner as to show clearly that the same is manufactured" by Kodak. This has effectively prevented Kodak from selling "private label" film, which is color film marketed under the brand of a retail outlet. The two other continuing provisions of the decree are Sections VI and VII, which limit Kodak's vertical interactions with dealers by forbidding exclusive dealing contracts and non-price vertical restraints. These provisions continue today, and the Government would have them continue for the foreseeable future.

### 4. The 1954 Decree

The 1954 Consent Decree differs from the 1921 Consent Decree in that it was entered, without an adjudication of facts or law. Although the United States filed a Complaint in the matter, charging Kodak with violating the Sherman Act by its practices relating to the sale of color film throughout the country, the case settled immediately and the consent decree was entered by the Honorable John Knight, another member of this Court.

The 1954 decree is similar to the 1921 decree in its two functions: first, it mandated short-term action, which required Kodak to introduce Ektachrome-brand slide film, and second, it provided for long-term regulation, which forbade, among other things, "tying or otherwise connecting in any manner the sale of [Kodak's] color film to the processing thereof."

The transcript of the hearing at which the 1954 decree was adopted reflects an understanding on the part of Kodak, which went unchallenged by the Government, that the decree might be subject to revision in the future. At the hearing, Kodak counsel noted that:

> The decree is the best that the Government and the company could devise. However, we have both realized that we cannot foresee how the business of processing colored film will develop over the ensuing years. In consenting Eastman Kodak has advised the Government that it may in the future have to appeal to this Court for relief, either on the one hand pursuant to these special provisions contained in the decree, or, secondly, pursuant to the general retention of jurisdiction by this Court which is specifically provided for by Section 17 of the decree, and, third, pursuant to the authority granted to this Court by Rule 60–B of the Rules of Civil Procedure which rule gives the Court broad powers to modify the decree when it. is no longer equitable or for any other justifiable relief.

Kodak argues that the restrictions of the 1954 decree should be removed because circumstances have changed since 1954 and "it is no longer equitable" for them to remain in place.

### 5. Decree Modifications

Both decrees have been modified by this Court in the past. The 1921 decree has been modified four times: on May 8, 1924, May 13, 1926, January 10, 1929, and June 19, 1935. All of these modifications were relatively minor. The 1954 decree was modified once, in 1961, when this Court found that Kodak had satisfied several provisions of that decree. No modification to either decree has been attempted since 1961.

### THE MOTION TO MODIFY OR TERMINATE AND HEARING

On May 20, 1993, after protracted negotiations failed to produce a result acceptable to both parties, Kodak filed a motion for modification or termination of both the 1921 and 1954 decrees. The Government requested more time to complete its investigation concerning whether the modification or termination of some or all of the provisions of the decrees was appropriate. The Government was granted this time and Kodak's application was held in place. Thereafter, the Government, in a letter to Kodak's counsel concluded that it was their position that termination of Sections VI, VII, and X of the 1921 decree, and Section V of the 1954 decree would be inappropriate. By this, the Government essentially served notice that it intended to oppose the termination of those

critical sections of both decrees and a hearing became necessary.

An order was issued on November 29, 1993, which scheduled the hearing for March 14, 1994. It also required that a notice be published stating the basis of Kodak's request and soliciting comments from the public for a sixty-day period prior to the hearing. Many comments were sent to the Court from politicians, competitors, manufacturer's organizations, and members of the public, expressing positions on both decrees. These comments were filed and have become part of the record.

### PRE–TRIAL MOTIONS

Kodak filed two additional motions prior to the commencement of the hearing. The first was a motion for summary adjudication of the legal standard to be applied. The second was a motion for summary judgment on Sections VI and VII of the 1921 decree. In a decision issued February 17, 1994, the decision on the motion for summary adjudication was reserved until the conclusion of the hearing on the merits and Kodak's motion for partial summary judgment was denied on the ground that genuine issues of material fact existed.

### PUBLIC COMMENTS

Through notices in various newspapers, periodicals and the Federal Register, see 58 Fed.Reg. 65398 (Dec. 14, 1993), the public was notified of the hearing on Kodak's motion to vacate the 1921 and 1954 Consent Decrees and was invited to submit relevant comments to this Court.[1] The Court received a total of 47 comments in letter and memoranda form from private citizens, politicians, trade associations and corporate rivals of Kodak (some of whom testified against Kodak in this hearing). The comments are divided into two categories—pro-Kodak and pro-Government—and a summary of each category is discussed below.

### 1. Pro–Kodak

Not surprisingly, the comments received in favor of vacating the 1921 and 1954 decrees were unanimous in their opinion that the decrees are obsolete and no longer reflect market realities.

The majority of the comments emphasized that the relevant geographic market for film is global, not national, and that Kodak presently competes at a disadvantage in the domestic film market. Some commentators stated that as the only domestic manufacturer of color negative film, Kodak's hands should be untied and it should be allowed to compete on a "level playing field" with its competitors, most of which are major and highly capitalized foreign corporations. One commentator stated that Kodak is disadvantaged because foreign competition in the domestic film market is government subsidized. Another commentator stressed the unfairness of decrees that favor foreign competition in the United States while domestic corporations are restrained from freely entering foreign markets, e.g., Japan, on equal footing. These commentators believe that Kodak's competitors can now compete in their own right and do not need government protection. It was also expressed that freeing Kodak from the decrees' constraints will permit the consumer to decide which competitors produce the superior product and thus establish market preference.

Comments were also received from trade associations representing areas in California, Colorado, Ohio, Massachusetts and New York. These comments stressed that recision of the decrees would promote the continued vitality of Kodak and, therefore, is essential to the economic well-being of their states and the nation. Moreover, these commentators were concerned that maintenance of the decrees would cost jobs because it is not likely that Kodak would be able to create new jobs if its business operations were unduly restricted.

The comments received from politicians stressed that the law should be "a servant of the people," and asked this Court to consider

---

1. The notice also instructed interested parties to forward copies of their comments to counsel for Kodak and the Government.

the impact of the decrees on their constituencies. These commentators stated that government intervention in Kodak's business affairs is hurting employment and the economy. Without surprise, Thomas T. Mooney, President of the Greater Rochester Metro Chamber of Commerce stated, "[c]ertainly in today's economic environment where jobs are so crucial, the health and profitability of Kodak is a matter of the highest concern."

One commentator favored vacating the 1954 decree because he feels photofinishing quality has dropped since the decree was entered. Another felt that consumers were inconvenienced by not being able to purchase film and processing for one price. Another favored vacating the decrees to help Kodak extricate itself from present financial difficulty. Still others argued that retention of the decrees will result in a loss of American jobs and increased taxpayer costs to enforce the decrees.

## 2. Pro–Government

The majority of comments received in favor of retaining the consent decrees were submitted principally by independent photofinishers. One feared that in seeking removal of the 1954 decree, Kodak intends to vertically and horizontally dominate the photofinishing industry. The commentator stated that Qualex's acquisition and/or absorption of the majority of photofinishers in the United States along with Kodak's marketing of the Colorwatch system demonstrates Kodak's tendency to seek a monopoly of photofinishing services. There was a concern that Kodak has marketed the Colorwatch system to minilabs in such a way so as to guarantee itself a greater share of the color paper market. If Kodak is permitted to tie its Colorwatch processing to film sales, it will close out photofinishing competition. The commentator also stated that Qualex now seek to install micro minilabs in stores which would directly compete with current stand-alone minilabs.

The Court also received comments from mail-order, wholesale and minilab photofinishers stating that their ability to remain competitive would be impaired should the 1921 and 1954 decrees be vacated. One commentator fears that elimination of the decrees will allow Kodak to sell film, paper and chemicals under exclusive arrangements which would drive out of business smaller concerns who are unable to carry a full line of products. In addition, independent photofinishers fear that, if Kodak is allowed to tie film sales and photoprocessing, they will be foreclosed from processing new Kodak film lines and ultimately will be driven out of business.

The Court also received lengthy submissions in the form of legal memoranda (in addition to those submitted at the hearing) from some of Kodak's competitors, including Agfa, Konica United States and Fuji Photo Film U.S.A., Inc. They argue that Kodak already has substantial market power in the film and photoprocessing industries and the termination of the decrees will allow Kodak to ultimately monopolize these industries. Konica and Fuji also argue that Kodak has monopoly power in the color paper and photographic chemical markets and oppose termination of that portion of the 1921 decree pertaining to the sale of these items. (The Government does not oppose recision of the decree as to these markets and, therefore, these concerns are not properly before the Court.) The commentators argue that maintenance of the decrees are essential to the economic health of the marketplace.

These concerns for the most part were also expressed through the testimony of witnesses and introduction of documents from both sides and, therefore, are dealt with in the body of this decision under various headings.

### THE HEARING

The hearing began on March 14, 1994. Kodak presented several witnesses from inside the company. George Fisher, Kodak's current Chief Executive Officer, testified about the negative effect of the decrees upon Kodak's ability to innovate and compete in a global market. Colby Chandler, an engineer and former CEO of Kodak before retiring in 1990, testified about Kodak's position in the color film and processing market at the time of the entry of the 1954 decree, its attempts to satisfy both decrees, and its current position in the color film processing market.

Thomas Busch, General Manager of Photofinishing Sales, and David Biehn, Vice President of Consumer Imaging, both testified about Kodak's inability to innovate new products for the market because of the outdated oppressive restrictions of both decrees.

Three experts in the photographic industry also testified in Kodak's behalf. Herbert Keppler, Publishing Director for *Popular Photography* and *American Photo* testified that film tests conducted by his magazine revealed that there were no significant quality differences between Kodak's film and any of its top three competitors—Fuji, Konica, and Agfa. He also testified that film produced by the Minnesota Mining and Manufacturing Co. ("3M") was of slightly lower quality but at a price point that was significantly lower than its four competitors. Peter Krause, who formerly worked for Agfa and is now a consultant and publisher of industry reports, testified concerning the nature of the film and photofinishing market in general, and specifically the degree of competition present in the film and photofinishing market today. Finally, Donald Becker, a photographic industry consultant and former president of Fox Photo, Inc., testified about the historical changes in the photofinishing market from the time he entered the market in 1949 to the present.

Kodak also presented testimony from two photofinishing providers, Scott Sims and Neil Cohen. Sims, the owner of Scott's Photo, Inc., in Rochester, New York, runs a specialty camera store and minilab at a single location. Cohen is the president of District Photo, Inc., which is one of the nation's largest mail-order photofinishers and which also operates minilab retail outlets in the District of Columbia area.

The Government principally presented witnesses from Kodak and Qualex's competitors. These included Stephen Logsdon, vice-president of Polaroid's conventional imaging division, Joseph Warren, vice-president of imaging systems for 3M and Paul Hudak, vice-president of photographic markets for Fuju Photo Film, USA. These witnesses testified about their companies' positions in the film industry and ⸱stated that relieving Kodak from the constraints of the 1921 decree

would adversely impact their ability to compete in the film business.

Similarly, Margaret A. Weston, CEO of Konica Quality Photo East and David McEowen, president of Fuji TruColor, Indiana, both testified that allowing Kodak to bundle film and photofinishing in ways now prohibited by the 1954 decree would inhibit their ability to compete in the photofinishing market.

The Government also called Thomas Froom, who is a merchandise manager for the Army and Air Force Exchange Service ("AAFES"). Froom testified that Kodak offered AAFES a premium to stock Kodak film exclusively, and also testified regarding Kodak's Volume Incentive Program ("VIP"), which rewards retail outlets that sell large volumes of Kodak film.

### JURISDICTION

Jurisdiction over the decrees, and the modification or termination thereof, was expressly reserved by this Court by the terms of Section XVII of the 1954 decree, and by the decision which led to the 1921 decree. *See United States v. Eastman Kodak Co.*, 226 F. at 81. Even without such an express reservation, this Court would still have such power "by force of principles inherent in the jurisdiction of the chancery[, for a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

### THE APPLICABLE STANDARD

■ The United States maintains that the applicable standard is set forth in *United States v. Swift & Co.*, 286 U.S. at 119, 52 S.Ct. at 464 which provides that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" permits modification or termination of an antitrust decree without the government's consent. This standard was further explained in *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). The Government argues that no case has explicitly overruled the ap-

plicability of *Swift* to the modification of antitrust decrees and that the recent decision in *Rufo v. Inmates of Suffolk County Jail,* — U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) applies only to decrees in cases involving vindication of public rights, and does not apply to. a decree entered against a private entity in an antitrust action.

Kodak argues that the "less stringent and more flexible" standard stated in *Rufo* applies, allowing a party to be relieved from a decree when it is no longer equitable for it to have prospective application. It also argues that later decisions have limited the *Swift* holding, almost to its facts and further that the two-part standard set forth in *Rufo* should be applied. That standard requires the party seeking modification to "establish[ ] that a significant change in circumstances warrants revision of the decree." If that standard is met, "the court should consider whether the proposed modification is suitably tailored to the changed circumstances." *Rufo,* —— U.S. at ——, 112 S.Ct. at 760.

The standard for relief from a consent decree is not the rigid *Swift* standard that the Government urges, but is instead a more flexible standard that allows a party to be relieved from a decree when it is no longer equitable to enforce that decree. Several sources support this view. The first is Federal Rule of Civil Procedure 60(b). That rule states that:

> On motion and upon such terms as are just, *the court may relieve a party from a judgment, order or proceeding for the following reasons:*
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or *it is no longer equitable that the judgment should have prospective application;* or (6) any other reason justifying relief from the operation of the judgment.

(Emphasis added.)

The Rule is only the starting point for the inquiry, however. Supreme Court and Second Circuit precedents strongly support the proposition that the *Swift* standard is not to be applied mechanically or stringently.

In *United Shoe,* 391 U.S. at 248, 88 S.Ct. at 1499, for example, the Supreme Court emphasized the unique facts of *Swift,* and particularly the situation which created the need for the decree. The Court emphasized that "the [*Swift* ] decree must, of course, be read in light of this context." *Id.* The Court noted that the market conditions which existed at the time of the *Swift* decree were relatively unchanged and that there was still a danger of unlawful restraint of trade.

Examination of the particular facts of *Swift* reveals that the defendants in that case were a closely-aligned group of major meat packers who had controlled the market for meat and groceries through horizontal agreements and control of the rail transportation of groceries. These defendants used a variety of means to attempt to circumvent the decrees while they were in place, and even succeeded to the extent that they managed to convince the Supreme Court of California to stay the decree pending further litigation for nearly four of those ten years. This stay was overturned by the Supreme Court about one year before the defendants brought the motion to terminate that was the subject of the *Swift* decision. *United States v. California Cooperative Canneries,* 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838 (1929). It was in this context that the Supreme Court examined the equities of decree termination, and the strong language used by the Supreme Court to maintain the decree had its source, at least in part, in the repeated attempts by the defendants to circumvent or overturn the decree.

The Second Circuit, recognizing that *Swift* was limited to the unique facts of that case, has consistently leaned toward implementing a more flexible standard. This standard was set forth in *King–Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31 (2d Cir.1969) and *New York State Ass'n for Retarded Children v. Carey,* 706 F.2d 956 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). In *King–Seeley,* Judge Friendly held that a court was "free to grant relief" if "modification was necessary to achieve the results intended, even though

this would take the form of reducing the restrictions imposed upon [the defendant]." *King–Seeley,* 418 F.2d at 35.

The most compelling reason for adopting the flexible standard, however, arises from the recent Supreme Court decision in *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). The Court in *Rufo* noted once again that *Swift* must be read in the context of the situation that gave rise to the case, and emphasized that although some conditions in the market affected by the decree in *Swift* had changed, the defendants were "positioned to manipulate ... prices in 1930, just as they had been in 1920." *Rufo,* —— U.S. at ——, 112 S.Ct. at 757. After quoting the "grievous wrong" standard, the *Rufo* court stated that "[r]ead out of context, this language suggests a 'hardening' of the traditional flexible standard for modification of consent decrees, [but] that conclusion does not follow when the standard is read in context." *Id.* —— U.S. at ——, 112 S.Ct. at 757–58. The Court elaborated that "[o]ur decisions since *Swift* reinforce the conclusion that the 'grievous wrong' language of *Swift* was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees." *Id.* —— U.S. at ——, 112 S.Ct. at 758. The Court then set out what Kodak argues is the appropriate standard to apply in this case: "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances." *Id.* —— U.S. at ——, 112 S.Ct. at 760.

While *Rufo* was primarily aimed at institutional reform decrees, the Second Circuit has applied the *Rufo* test broadly. It has held that *Rufo* applies not only in institutional litigation against government entities, but in other cases where equitable relief is applied. In *Still's Pharmacy v. Cuomo,* for example, the Second Circuit applied *Rufo* to a modification of a settlement agreement concerning the method of calculating state Medicaid reimbursements to pharmacists.

More recently, in *Patterson v. Newspaper & Mail Deliverers' Union,* 13 F.3d 33 (2d Cir.1993), the Second Circuit approved the use of *Rufo* in a motion to terminate a consent decree in a civil rights action. In that decision, Chief Judge Newman examined *Rufo* and the cases which interpreted it, and concluded that:

> [T]he flexible standard outlined in ... *Rufo* is not limited to cases in which institutional reform is achieved in litigation brought directly against a governmental entity. The "institution" sought to be reformed need not be an instrumentality of government. If a decree seeks pervasive change in long-established practices affecting a large number of people, and the changes are sought to vindicate significant rights of a public nature, it is appropriate to apply a flexible standard in determining when modification or termination should be ordered in light of either changed circumstances or substantial attainment of the decree's objective.

*Patterson,* 13 F.3d at 38.

The Seventh Circuit has gone even further—flatly declaring that *Rufo* gave the "*coup de grace*" to *Swift* and that *Rufo*'s flexible standard is "no less suitable to other types of equitable case." *In re Hendrix,* 986 F.2d 195, 198 (7th Cir.1993).

Two recent district court decisions also support the conclusion that *Rufo*'s "flexible standard" applies to modification of antitrust decrees. First, in *United States v. Agri–Mark, Inc.,* 1994–1 Trade Cas. ¶ 70,512, 1994 WL 88979 (D.Vt.1994), which involved the modification of an antitrust decree entered pursuant to the Clayton Act, Judge Billings rejected the Government's argument that the *Swift* standard should apply, and instead applied *Rufo.* Judge Billings' application of *Rufo* is both persuasive and directly on point.

The very recent decision in *United States v. Western Telephone Company,* Civil Action 82–0192 D.D.C. (April 5, 1994) by Judge Harold Greene of the United States District Court for the District of Columbia also indicates that *Rufo* is the standard to be applied to antitrust decrees. Noting that *Rufo* "provides ample fodder for those inclined to read

its holding more broadly," Judge Greene concluded that both the Seventh Circuit and the Second Circuit have allowed *Rufo* to apply to contexts other than reform decrees. In particular, Judge Greene pointed to Chief Judge Newman's language in *Patterson* for the principle that *Rufo* applies to all equitable proceedings, including those to modify an antitrust decree. See *Western Telephone*, Slip Op. at 19.

The Government argues that the adoption of the *Rufo* standard in the *Western Telephone* case is merely dicta, because Judge Greene noted that his decision would have been the same whether it was decided under the *Swift* or *Rufo* standard. This is incorrect, because Judge Greene relies solely on the *Rufo* standard for his determination, and although he denied the motion for modification of the decree, he made clear that the *Rufo* standard would be the one applied in future applications for relief. Moreover, his reasoning in the decision is highly persuasive.

Finally, *Rufo* is the appropriate standard to apply in this case because the elements of the decrees in question here share common concerns with institutional reform decrees. Sections VI, VII, and X of the 1921 decree and Section V of the 1954 decree, put simply, impose continuing restrictions on Kodak's interaction with the market. Market prices, competition, and marketing strategy are thus affected by these decrees, and changes in the decrees can have economic impact on a large number of Americans. In effect, the changes sought in these antitrust decrees fit the description given by Judge Newman in *Patterson*, because Kodak seeks pervasive change in long-established practices affecting a large number of people, and seeks the changes to vindicate significant rights of a public nature, *i.e.*, the consumer benefits from increased competition which Kodak claims is stifled by both decrees. Kodak's arguments for termination or modification of these decrees rest on the premise that the decrees have outlived their usefulness and no longer promote, but instead inhibit, competition. In that sense, Kodak's request for relief seeks to vindicate significant public rights, and fits the *Patterson* standard.

Therefore, Kodak's request for relief from both the 1921 decree and the 1954 decree, like the request for relief from the decree in *Patterson*, must be judged by the flexible *Rufo* standard because it allows the Court to modify the decrees to fit changes in market conditions. The strict *Swift* standard would bind the Court to the terms of its own decree even if it is clear that changed circumstances have made it inequitable to apply the decree. Precisely for these reasons, and as the Second Circuit and Supreme Court have recognized, the flexible *Rufo* standard will be applied in determining Kodak's motion to terminate the decrees.

### THE 1921 DECREE

■ In support of its motion to eliminate and/or modify certain sections of the 1921 decree, Kodak contends (1) that substantial changes have occurred in the marketplace for film during the seventy-three years since the decree was entered; and (2) that there have been substantial changes in the law, and taken together, these factors justify the relief sought by Kodak. As a consequence of those substantial changes which it alleges have taken place in the market for film, Kodak also contends that it no longer possesses "market power," defined generally as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Because of the size and financial strength of its competitors, Kodak argues that it does not have the market power necessary to drive its competitors out of the marketplace, or harm consumers through an anticompetitive pricing structure.

Conversely, the Government maintains that Kodak still retains market power which can be traced to the illegal activities that gave rise to the 1921 decree. Although competitors have entered the market and have claimed an increasing market share, the Government contends that competition is not yet strong enough to eliminate Kodak's market power. Consequently, it is the Government's view that the disputed sections of the decree should remain in place in order to eliminate the illegally acquired market power which Kodak still possesses, and which enables it to extract a premium price for its film.

**1466**

The following represents a summary of proof submitted in support of the Court's findings relevant to Kodak's application for modification or termination of the 1921 decree.

## 1. The Expert Witnesses

■ Kodak's expert witness was Professor Jerry Hausman, MacDonald Professor of Economics at the Massachusetts Institute of Technology. Professor Hausman has a Ph.D. degree in economics from Oxford University (1973), and has published extensively in the fields of econometrics, public finance and applied economics. He has been a consultant to Kodak since 1987, and in addition, has testified in antitrust actions involving the printing and beer industries.

In preparation for his testimony, Professor Hausman visited a Qualex macrolab and a Fuji minilab, both located near Washington, D.C. In addition, he testified that he studied the history of Kodak, read "old decisions" and the decrees at issue, and, using econometrics, analyzed empirical data (known as Nielsen "scan trac" data) representing consumers' film purchases at food markets in five major cities. The data was collected as the bar code on each package of film was "scanned" at the checkout register, and the information concerning the purchase was thereby recorded. Professor Hausman also analyzed the same data collected from K Mart stores nationwide.

The Government's expert was Professor Robert Masson of Cornell University. Professor Masson has a Ph.D. degree in economics from the University of California at Berkeley (1969), and has published extensively in the industrial organizations field. He previously worked as an economist and consultant at the Department of Justice. He has extensive experience in the milk industry, but has neither studied, nor consulted for anyone, in the photographic industry.[2] Professor Masson testified that he was hired by the Justice Department to serve as an

expert in this matter in early February 1994, some six weeks before the hearing. He stated that he did not collect or analyze any empirical data, and the only persons he interviewed, primarily through conference calls, were the Government's witnesses, who, with one exception, were all employees of Kodak's competitors.

In general, the Court found Professor Hausman to be the more helpful of the two experts. He was much more familiar with the photographic industry, and with the literature, particularly the Landes and Posner article discussed *infra*, which both he and Professor Masson acknowledged to be authoritative. In addition, Professor Hausman spent considerably more time and effort preparing for his testimony than did Professor Masson, who had been hired just prior to the hearing.

Moreover, Professor Hausman previously served as an expert in an antitrust matter involving the beer industry. There are foreign and domestic competitors in both the beer and film industries in the United States, and each industry markets their products nationally and/or regionally to establish brand name identities and thereby compete for shelf space in retail outlets. In contrast, milk is advertised generically, without reference to any particular brand, by the dairy industry's trade association on behalf of local farmers nationwide. Because of the similarities in marketing of beer and film in this country, and in the nature of competition in both industries, Professor Hausman's previous experience as an expert gave his testimony much more weight with respect to the economic issues presented than Professor Masson's experience in the milk industry.

## 2. The Relevant Market for Film

■ In analyzing whether a firm possesses market, or monopoly power, "the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d

---

**2.** Professor Masson candidly admitted that "[w]ith six weeks time I would never be able to tell you that I have concern [about] anything beyond this consent decree question ... I have not done an expert study of [the photographic]

industry. When I worked on the milk cases, I mean, we spent easily a year living, breathing milk, more than eight hours a day before we went to Court on [the] monopolization case...." Tr. at 1524.

Cir.1979), citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391–93, 76 S.Ct. 994, 1005–6, 100 L.Ed. 1264 (1956). The relevant market "provides the basis on which to balance competitive harms and benefits of the restraint at issue." *Los Angeles Memorial Coliseum Com'n v. N.F.L.*, 726 F.2d 1381, 1392 (9th Cir.1984). In an antitrust context, the relevant market has two components: the product market and the geographic market. *Id.* at 1392.

### A. The Relevant Product Market

■ The relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *du Pont*, 351 U.S. at 404, 76 S.Ct. at 1012; *see also Los Angeles Memorial Coliseum Com'n*, 726 F.2d at 1392 ("Product market definition involves the process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.") In essence then, the relevant product market is composed of products which are reasonably interchangeable for the same or similar uses.

■ In 1921, photographic film ("film") was the only medium available to the amateur consumer who wanted to preserve an image. However, the modern consumer has choices that did not exist seventy-three years ago, with film being only one means to that end. As an example, a consumer can chose to preserve an image on video taken by a "camcorder," the use of which is widespread and increasing each year and unheard of in 1921. In contrast to film, a video taken on a camcorder does not require processing and can be immediately viewed on a video cassette recorder. Kodak's research indicates that, within the first year after a household acquires a camcorder, the purchase of traditional photographic film by that household drops by thirty percent.

Although other image-preserving mediums are available to the consumer, Kodak's expert, Professor Hausman, testified that, for purposes of analyzing the continued viability of the 1921 decree, **the relevant product market should include only amateur color negative photographic film,** which represents the majority of film sold. The Government's expert, Professor Masson, did not disagree with this conclusion. **Accordingly, the Court adopts this finding.**

Where Kodak and the Government apparently disagree is whether the market for amateur color negative film should be broken into smaller product markets defined by film speed, such as 100 speed, 200 speed, etc., or by film size, such as 35 millimeter, etc. Professor Hausman testified that as a matter of economics, two or more products should be considered to be in the same market if firms can readily switch their production from one product to the other(s). This is characteristic of the film industry because manufacturers have the capability to readily switch production between different film speeds or sizes. No compelling evidence was offered to contradict this testimony. Legal authority also supports this conclusion. *See, e.g., Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir.1975) (where production substitutability is high, products should be treated as part of the same market); *Frank Saltz & Sons, Inc. v. Hart Shaffner & Marx*, 1985–2 Trade Cas. (CCH) ¶ 66,768 at 63,721 (S.D.N.Y.1985) (manufacturers of inexpensive men's suits included in market with manufacturers of better men's suits, because the former could easily and quickly convert to the manufacture of better men's suits). **Accordingly, the Court finds that the relevant product market for amateur color negative film includes all film speeds and sizes.**

### B. The Relevant Geographic Market

■ Kodak and the Government disagree on defining the relevant geographic market. Kodak defines the market as including the United States, Western Europe, and Japan (hereinafter referred to as a "world-wide" market), while the Government contends that the relevant geographic market should include only the United States. Kodak's share of the world-wide market for amateur color film is 36 percent, while its share in the United States is estimated to be 75 percent of dollar sales, and 67 percent of unit sales.

Kodak contends that its 36 percent share of the world-wide market is evidence that it does not possess market power, while the Government argues that Kodak's market dominance in the United States alone is evidence of its market power.

The relevant geographic market describes the "area of effective competition in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). There is no disagreement that film is produced by five multinational corporations which manufacture and sell film world-wide. Kodak, which is the only company manufacturing film in the United States, sells its film both domestically and overseas. Fuji manufactures film in Japan and in the Netherlands, Konica manufactures film in Japan, Agfa manufactures film in Germany, and 3M manufactures film in Italy. Each of these manufacturers produces amateur color negative film using generally the same emulsions for world-wide distribution. Each is essentially of equal quality.

Professor Hausman identified two articles that are widely recognized in the economic literature on the subject of relevant geographic market definition: *The Problem of Geographic Market Delineation in Antimerger Suits,* 18 Antitrust Bulletin 45 (1973), by K. Elzinga and T. Hogarty ("Elzinga & Hogarty"), and *Market Power in Antitrust Cases,* 94 Harvard Law Review 937 (1981), by J. Landes and R. Posner ("Landes & Posner"). Landes & Posner, for example, argue that

> if a distant seller has some sales in a local market, *all* its sales, wherever made, should be considered a part of that local market for purposes of computing the market share of a local seller. This is because the distant seller has proved its ability to sell in the market and could increase its sales there, should the local price rise, simply by diverting sales from other markets.

94 Harv.L.Rev., at 963 (emphasis in original).

The proof at the hearing established that the production of photographic products is capital-intensive and that all world markets are supplied by Kodak, Fuji, Konica, Agfa, and 3M. Each of the foreign manufacturers has proved its ability to establish market share in the United States, and imported film comprises one-third of the film sold in the United States. It was Professor Hausman's opinion that film manufacturers have excess capacity, and that the supply of film is "elastic," meaning that foreign manufacturers could quickly increase the supply of film for U.S. consumption if Kodak attempted to restrict output and raise prices. The Government did not introduce any evidence to dispute Professor Hausman's opinion.

Based upon this empirical data and the ability of foreign competitors to increase film production for U.S. consumption, Professor Hausman concluded that the film being supplied to the United States from Japan and Western Europe is clearly constraining Kodak's ability to raise domestic film prices.[3] He also testified that he measured imports and exports of film into the United States, and that the quantitative flow of imports and exports is "significant" under the Elzinga & Hogarty test of market definition.[4] Professor Hausman concluded that, under either the Landes & Posner or Elzinga & Hogarty methodologies, the relevant market for amateur color negative film is world-wide, and thus world-wide sales of Kodak and of its foreign competitors should be counted in computing Kodak's market share for amateur color negative film.

Professor Masson, in contrast, testified that the photographic industry is composed of several regional markets across the world, and that only the United States is the relevant geographic market for purposes of ana-

---

3. As summarized by Landes & Posner, "[u]nused capacity implies a high supply elasticity of the competitive fringe because such capacity can be brought into production promptly and with no increase in production costs; *hence it is an effective constraint on the pricing of the local seller."* 40 Harv.L.Rev., at 966. (emphasis mine).

4. Under this test, a "significant" quantity of imports also restrains a firm's ability to raise domestic prices.

lyzing Kodak's application. His analysis was based upon the fact that, while competition is global, film manufacturers employ different marketing strategies for different regions.[5]

However, the proof established that, while there may be slight differences, each manufacturer produces film for world-wide distribution using generally the same emulsions, and that the films are of comparable quality.[6] The fact that manufacturers have to take cultural differences into account when formulating marketing strategies does not vitiate the economic reasons advanced by Professor Hausman in support of his conclusion that the relevant market for film is world-wide.

█ Professor Masson conceded that he did not calculate whether the Elzinga–Hogarty test was satisfied by photographic industry empirical data, but that he was willing to accept Professor Hausman's conclusion that the flow of imports and exports is "significant." Professor Masson was, however, critical of both the Elzinga–Hogarty test and of what he called a "blanket application" of the Landes & Posner methodology. In particular, he testified that their approach is not applicable in this case because of what he called the "cellophane" problem, and because consumers do not view imported film as perfect substitutes.[7]

The *Cellophane* problem was vigorously pursued during the cross-examination of Professor Hausman, who was accused by Government counsel as having committed the elementary *Cellophane* fallacy. In *United States v. E.I. du Pont de Nemours*, also known as the *Cellophane* case, the issue was

whether du Pont had monopoly power, and thus it was important in that case to determine whether cellophane and other flexible wrapping materials were reasonably interchangeable at the then-current price of cellophane. The Supreme Court ultimately defined the market for flexible wrapping materials on the basis of evidence of a high cross-elasticity of demand[8] between cellophane and other flexible wrapping materials. *Market Power in Antitrust Cases*, 40 Harv. L.Rev. at 960. However, Landes & Posner postulated that in so finding, the Court committed economic error.

Landes & Posner noted that "every monopolist faces an elastic demand ... at its profit-maximizing output and price, [and thus] there is bound to be some substitution of other products for its own when it is maximizing profits, even if it has great market power." *Id.*, at 961. They concluded that "the high cross-elasticity [in the *Cellophane* case], far from proving a lack of market power, was a necessary condition of market power." *Id.* As a result, Landes & Posner opined that it was "improper in that case to include in the market substitutes that may have been attractive to consumers only because the market price was far above the competitive level[.]" *Id.*, at 970–71.

In essence, then, Landes & Posner argue that a high cross-elasticity of demand may be the result of monopoly power. At a high enough price, even poor substitutes look good to the consumer. Professor Hausman had previously testified that, based upon his econometric analysis of Nielsen scan trac

5. For example, Professor Masson testified that "the strategies are just entirely different across the different countries ... [t]hese are subtle, but you're really targeting different markets with different strategies, and, of course, its global in the sense that there's only five players, and if you're going to buy film in Thailand, people aren't going to build a plant there. So there's some—you know, there is global marketing, but there is a very specific target in the United States market, and its got specific people with specific ways of looking at the marketing and opinions of consumers." Tr. at 1401–02.

6. David Biehn, a Kodak vice-president in charge of Consumer Imaging, testified that no manufacturer is producing film for a particular region of the world, although "sometimes the colors can

be modified somewhat based upon the area of the world, *but that's more in the professional arena than the amateur arena."* Tr., at 425. (emphasis mine).

7. "In our case, I think where this breaks down is in two areas. One is *Cellophane* and the other is differentiating product as viewed by the consumers." Tr. at 1518.

8. As defined by Landes & Posner, " '[c]ross-elasticity' of demand refers to the effect on the quantity demanded of one product of a small change in the price of another product. A high cross-elasticity of demand implies that the products are good substitutes at the current price." 40 Harv. L.Rev., at 960.

data, there was a high cross-elasticity between Kodak's price and the quantity of Fuji film demanded. Because of the cross-elasticities, or reasonable interchangeability between the two types of film, Professor Hausman opined that Kodak did not have market power.

On cross-examination, Government counsel contended that Professor Hausman committed the same economic error as that made by the Supreme Court in the *Cellophane* case. Professor Masson also concluded that Professor Hausman fell prey to the *Cellophane* fallacy. As noted above, Professor Masson then opined that the *Cellophane* problem was one reason why the Landes & Posner approach to determining relevant geographic markets was not viable in this case. Professor Masson concluded that it is improper to define the relevant geographic market as including world-wide production when imported film may be attractive to United States consumers *only because* Kodak's U.S. film prices are above competitive levels. Under this scenario, the high cross-elasticities found by Professor Hausman, far from demonstrating lack of market power, may actually signify Kodak's market power. The implication is that imported film may not be reasonably interchangeable with Kodak film at a *competitive* price, and defining the market broadly by including foreign production, as advocated by Professor Hausman, would be improper.

Professor Hausman's explanation proved both helpful and plausible. He explained that in the *Cellophane* case, du Pont did not have any close competitors for cellophane, and the other flexible wrapping materials were not particularly good substitutes for cellophane. In this case, the evidence established that the branded film of Kodak's competitors is *of comparable quality to Kodak's film*, and *is a very good substitute for the film manufactured by Kodak*. Thus, while he acknowledged that a *Cellophane* problem can arise when defining geographic markets

if the products are not good substitutes, Professor Hausman opined that this factor simply was not present in this case.

I find that in this case no *Cellophane*-type problem is presented because Fuji, Konica, Agfa, and 3M are selling the same product as Kodak, namely amateur color negative film, and they are each competing for the same customers. While there may be subtle quality differences among the films of each manufacturer, Professor Masson's argument that the products are sufficiently differentiated so as to create a *Cellophane*-type problem is untenable and unsupported by the record as a whole in this case.[9]

■ Although it was Kodak's burden to prove that the relevant geographic market is world-wide, the Government failed to offer any credible evidence in rebuttal. Other than attacking the Elzinga & Hogarty and Landes & Posner methodologies, the Government's primary argument was that the relevant geographic market should be defined based upon consumer perceptions, which translate into market share. In its Proposed Findings, the Government argues that "[f]irms can compete in a number of regional markets that together comprise the world. The market shares in each region reflect the way consumers perceive brands of film. These consumer perceptions determine the ability of firms to compete in those markets." Government's Proposed Findings at 2.

No credible authority cited to the Court, however, supports the Government's contention that relevant geographic markets should be defined based upon consumer perceptions or market shares alone. Rather, the caselaw discussing relevant geographic markets focuses on "the area of effective competition ... in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric Co.*, 365 U.S. at 327, 81 S.Ct. at 628.

The evidence proffered by Kodak shows that the area of effective competition be-

**9.** For example, Herbert Keppler, a Kodak witness who is publishing director of *Popular Photography* and *American Photo* magazines, testified that "Fuji film is an excellent film with very fine, fine graininess, with very good latitude. It would be very hard for any one to tell a good

Fuji print from a good Kodak print or from any other." He also stated that Konica is "[a]lmost identical to Fuji. You might find a hair better with Fuji, but really we're talking in terms of excellence in a very narrow band." Tr. at 258–59.

tween the five film manufacturers is the entire world, and purchasers of film can "practically turn" to Kodak products produced in the United States, or to the products of foreign manufacturers produced in Western Europe and Japan. Landes & Posner make the point that "in many industries market shares are systematically exaggerated because of exclusion of the output of foreign producers selling in the United States." 40 Harv.L.Rev., at 966. The evidence here suggests that Kodak's market share would similarly be exaggerated if the relevant market was defined as solely a United States market. **Accordingly, I find that the relevant geographic market includes the United States, Western Europe and Japan; in short, a world-wide market.**

### 3. Market Power

#### A. World-wide

A party has market power if it has " 'a power of controlling prices or unreasonably restricting competition.' " *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 68 (2d Cir.1984), *quoting United States v. E.I. du Pont*, 351 U.S. at 389, 76 S.Ct. at 1003. Citing *Broadway Delivery Corp. v. United Parcel Service, Inc.*, 651 F.2d 122, 128 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), the court in *Hayden Publishing* stressed that "the strength of competition, the probable development of the industry, and consumer demand, as well as the percentage of market share enjoyed by the alleged monopolist, were among the factors pertinent to the determination of [monopoly power]." 730 F.2d at 68–69.

However, the "predominant factor appears to be market share[.]" *State of New York by Abrams v. Anheuser–Busch, Inc.* "Anheuser–Busch", 811 F.Supp. 848, 873 (E.D.N.Y.1993).

In *Broadway Delivery Corp.*, the court noted that a market share below 50 percent is "rarely evidence of monopoly power[.]" 651 F.2d at 129. Having defined the relevant geographic market as the entire world, and having found earlier that Kodak's world-wide market share is approximately 36 percent, it is quite clear that, on the basis of market share alone [10] without reference to the other factors, Kodak does not possess market power. *See also Anheuser–Busch*, 811 F.Supp. at 873 (a 39 percent share "is below that which has been deemed sufficient to confer market power in any previous decision".)

Other factors support this determination. The proof shows that Kodak's competitors are each well-financed, billion-dollar, multinational corporations selling film all over the world. According to Professor Hausman, competition among these producers has intensified in the United States, as evidenced by his finding that nominal and inflation-adjusted film prices have decreased over time in the United States. While other factors may be partially responsible for this development, Professor Hausman testified that this decline is due primarily to competition.

Outside of the United States, Konica and Fuji have strong positions in Japan, and Agfa has a strong position in Western Europe (Agfa in fact describes itself as the film leader in Europe). However, each of the other film producers are vigorously competing in those areas as well.[11] Thus, the film industry is subject to strong competition world-wide, which militates against a finding that Kodak possesses market power.

With respect to probable future developments in the industry, testimony established that all major competitors in the industry are technologically innovative. In particular, Professor Hausman testified that Kodak and

---

10. Peter Krause, a photographic industry consultant and publisher of the *International Photo Processing Industry Report*, which he described as containing the most comprehensive and reliable information in the photographic industry, testified that on a world-wide basis Kodak has a 36 percent market share, Fuji has a 34 percent share, Konica has a 16 percent share, Agfa has a 10 percent share and 3M has a 4 percent share. Tr. at 229.

11. Indeed, David Biehn, Kodak's General Manager of Consumer Imaging, testified that "[competition] will always be there. One of the things you have to understand is that we are dealing with companies that are based outside of this country and compete in the world market. We don't view nor do they view this country as a [sic] entity by itself." Tr. at 455.

Fuji were among the top ten companies in 1993 in terms of the number of patents filed in the United States. David Biehn testified that "[Kodak is] in a competitive race from a technology standpoint. We are in an innovative race where other manufacturers are innovating at very high rates as well as Kodak and that the trends in the marketplace clearly indicate that we are not in a position to gain [market] share." Tr. at 457. Again, this testimony was not contradicted.

Fuji, for example, stated in its annual report that it "is a leader in traditional silver haloid imaging and is also at the forefront of electronic imaging technology." Tr. at 1335. Fuji introduced the world's first digital camera, and intends to "develop electronic image media in tandem with traditional silver haloid photography to create a new image culture." *Id.* George Fisher, Kodak's Chairman, Chief Executive Officer and President, also testified that the advent of electronic imaging will significantly change the way in which an image is captured, stored, processed and reproduced, and that "it will be a fiercely competitive business ... with significant crossover [with the traditional business] at almost every level[.]" Tr. at 397–98.

The record shows that Kodak is in a competitive race against large, well-financed innovators seeking to develop and mass market the next generation of imaging products. While Kodak is clearly a major player with respect to probable future developments in the photographic industry, there was a clear absence of proof that Kodak has the market for future products "cornered," or that Kodak will be able to "control prices or exclude competition" with respect to the introduction of new products. Given the competitive nature of the modern imaging marketplace, including the constant pressure to develop new products in order to maintain customers and market share, it defies commercial realities to suggest that Kodak has monopoly power in the relevant geographic market. **Accordingly, I find that Kodak does not possess the power to control prices or exclude competition.**

## B. The United States

■ Even if the relevant geographic market was limited only to the United States, the Government's position that Kodak has monopoly power is not substantiated by the proof. Although the Government estimated Kodak's market share at 69.9 percent of units sold, and 80.2 percent of dollar sales (*see* Government Exhibit 5), Professor Masson conceded during his cross examination that Kodak's dollar sales market share in Exhibit 5 is overstated by five or six percentage points because the numbers do not reflect promotional allowances and rebates. Kodak estimated its market shares as 67 percent of unit sales and 75 percent of dollar sales, numbers which are comparable to the Government's estimates in Exhibit 5 after correcting for the promotional allowances and rebates omissions. **Accordingly, I determine as my finding of fact that Kodak's market shares in the United States is 67 percent of unit sales and 75 percent of dollar sales.**

■ The relevant measure, however, is the unit sales market share. Paul Hudak, Vice–President and General Manager of Fuji Photo Film U.S.A. testified that market share data is more reliable if computed in units sold because "a roll of film can have a different selling price and it can distort the issue, but a unit is a unit." Tr. at 1286–87. Although the Second Circuit noted that "a share between 50 [percent] and 70 [percent] can occasionally show monopoly power, and a share above 70 [percent] is usually strong evidence of monopoly power[,]" *Broadway Delivery Corp.,* 651 F.2d at 129, market share alone does not support a finding of monopoly power. As the Seventh Circuit stated in *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins.,* 784 F.2d 1325, 1336 (7th Cir.1986), "[m]arket share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them." *See also,* Landes & Posner, 40 Harv.L.Rev. at 950 ("exclusive and uncritical reliance on market share data tends to produce an exaggerated impression of market power").

Price elasticities are better measures of market power. As the court in *Anheuser–Busch* noted, "[i]f market power is the ability

to raise prices and maintain such prices above competitive levels, then a high degree of price sensitivity in a market exemplifies a lack of market power." 811 F.Supp. at 873.

In this case, Professor Hausman analyzed Nielsen scan trac data of film purchases using the same econometric techniques he employed in *Anheuser–Busch.* The data was taken from food stores in five major cities and from K Mart stores nationwide. His analysis revealed that film purchasers are also price sensitive, and will shift between Kodak, Fuji and private label film on the basis of changes in price.

Using the data from actual cash register sales at K Mart stores nationwide, Professor Hausman found that when K Mart ran a sale on Kodak film, the quantity of Kodak film purchased increased significantly. Tr. at 606; Kodak Exhibit 32. The quantity purchased then fell when the price was increased to its normal level. In terms of Kodak's own demand elasticity, Professor Hausman estimated that if Kodak were to raise prices by five percent, it would lose ten percent of sales. Tr. at 616–17. He concluded that cross-elasticities between Kodak and Fuji film are high, which shows that consumers find Fuji to be an acceptable substitute for Kodak film. Tr. at 617.

Supply elasticity is another factor affecting the market power determination. Fuji, Konica, Agfa, and 3M, all Kodak competitors manufacturing film in Europe and Japan, have each demonstrated that they can profitably sell film in the United States. As noted *supra,* Professor Hausman opined, on the basis of other testimony and published reports, that these competitors have excess capacity and can increase output if Kodak attempted to restrict its own output or to raise prices above competitive levels. If Kodak were to restrict output or raise its prices, demand for substitutes would increase, and these competitors could readily increase the supply of their film to retailers in the United States.

On the basis of the supply and demand elasticities in the film industry, Professor

Hausman opined that Kodak does not have market power, because it does not have the power to "control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. at 391, 76 S.Ct. at 1005. In his opinion, consumers are becoming more, not less, price sensitive, which explains the increasing popularity of private label film. Private label film, a highly price-sensitive market segment, now has a 12.8 percent market share according to Government Exhibit 15,[12] and is the fastest growing segment in the amateur color negative film market. As demonstrated by Kodak Exhibit 36, Kodak's nominal and inflation-adjusted film prices have declined over the previous two years, due primarily, in Professor Hausman's opinion, to increasing competition.

In addition to demand elasticities, whether there are any barriers to entry is another factor which is relevant to the market power inquiry. In *Anheuser–Busch,* the court noted that high barriers to entry can affect the ability of new participants to enter the market and can thus result in giving the established participants more power in the market. 811 F.Supp. at 873 (citation omitted).

Professor Hausman testified that the barriers to entry in the manufacture of photographic film are particularly high due to the huge financial investment (in the hundreds of millions) a firm would have to make in plant and equipment. However, this factor is offset by the fact that the same investment in plant and equipment, once made, is a barrier to exit from the market, as well. The investment is a sunk cost which cannot be recouped through the sale of the physical assets. Tr. at 641. Thus, although there are only five firms manufacturing film in the world, there is very little chance that any of them will be driven out of the market by Kodak or any other competitor.

**Accordingly, I find that, even if the relevant geographic market were limited only to the United States, Kodak still does not possess market power.**

12. Various witnesses testified that private label's market share is between 15 percent to 20 percent of the market. Thus, the Government's estimate, while not unreasonable, may be somewhat understated.

## 4. Premium Pricing and Consumer Perceptions

### A. Premium Pricing

██ The Government contends that the ability to charge a premium price for a product without any significant quality advantage is strongly indicative of market power. As evidence, the Government cites what it calls the "premium" price Kodak charges for film in the United States, and also points to differences between the price of Kodak film in the United States and overseas.

Various representatives of Kodak's competitors testified that Kodak film sells for a premium over the price of their respective products. To test whether there was a price premium between Kodak and Fuji (Kodak's closest competitor in the United States), Professor Hausman compared the price of Kodak and Fuji film during the one year period November 1992 through October 1993.

In comparing prices charged by mass merchandisers, such as K Mart, Wal Mart and Target stores, the relevant data revealed that there was essentially no difference in the price between Kodak and Fuji film over time: "[s]ometimes Fuji's more expensive, sometime[s] Kodak's more expensive, but in the end [the difference] is one percent, you know, which so far as I'm concerned is essentially zero." Tr. at 626. Professor Hausman also tested data collected in 1988 from mass merchandisers and found a 6.3 percent premium for Kodak film over Fuji film.

Testimony established that mass merchandisers account for the majority of film sales in the United States, consisting of between forty-five and fifty percent of total sales. Biehn, Tr. at 431; Hudak, Tr. at 1287. Thus, Professor Hausman found that in mass merchandisers, which were acknowledged by both sides to have tremendous purchasing and merchandising power, and which are the largest retail outlets for film, there was essentially no price premium paid for Kodak film. More importantly, the price premium which did exist four to five years earlier has disappeared, due in Professor Hausman's

opinion, to increases in the quality of Fuji film as perceived by consumers. This data also supports my previous finding that Fuji and Kodak film are acceptable substitutes for one another.

In food and drug stores, which are the other main outlets for film in the United States,[13] Professor Hausman found only a 4.5 percent difference between the price of Kodak and Fuji: "[a]gain, sometimes Fuji is more expensive, sometimes Kodak is more expensive, but overall Fuji is about four and a half percent cheaper across this one year period." Tr. at 627.

Although the only price comparison made was between Kodak and Fuji film, the Government's contention that Kodak's price is significantly higher was not supported. Nor did the Government offer any empirical evidence of its own in rebuttal.

More importantly, testimony from Fuji's representative indicates that the difference in price between Kodak and Fuji results not from an intention on Kodak's part to extract a premium price for its film, but from a purposeful marketing strategy on Fuji's part to undercut whatever price Kodak is charging for its film, which Fuji considers to be the industry standard. Paul Hudak testified that Kodak "set[s] the price level for film in the United States ... [t]hat's a given[.]" Tr. at 1331. Fuji intentionally prices its film lower than Kodak in order to make its product more attractive to retailers and to the consumer. Tr. at 1284–85. He stated that "our strategy for penetrating and being successful in the marketplace from a wholesale price standpoint has been [to price] Fuji film lower than Kodak film ... [w]e encourage the retailer to take some of that price gap and pass some of it along to the consumer in the form of a lower retail price and to take some of the remaining price gap and put it into their profit line." Tr. at 1284–85. Far from proving that Kodak has the power to control prices and exclude competition, this testimony instead shows that competition between Kodak and Fuji in the United States is vigorous, that Fuji has attained market share

---

**13.** Professor Hausman testified that mass merchandisers and food and drug stores account for

95 percent of the film sold in the United States.

as a result of such competition and that the consumer reaps the benefits in the form of lower prices.

The Government also charges that Kodak engages in systematic price discrimination, defined by Professor Masson as "the ability to charge a higher price in one market where you have more power than in another market where you have less power." Tr. at 1393. In support of its argument, the Government cites price data provided in Kodak's interrogatory answers.

However, during cross-examination of Professor Masson it was pointed out that the interrogatory data represents prices at one point in time—a snapshot, which Professor Masson acknowledged is not necessarily evidence of *systematic* price discrimination. Moreover, as Professor Hausman testified, it is a tricky business comparing prices between different countries because of the effects of monetary exchange rates and different distribution systems. For example, he estimated that in France (the European country in which the distribution system is most like that in the United States), Kodak's price for film was virtually identical to that charged in the United States. Conversely, in Japan the distribution chain, and the prices charged, are entirely different. Because of the analytical problems created by currency fluctuations, differing distribution systems, and the fact that the data represent only one point in time, **I find that the regional price data provided by Kodak in its interrogatories has limited evidentiary value, and I give no weight to the Government's systematic price discrimination argument.**

### B. Consumer Perceptions

█ As discussed *supra*, the empirical evidence established that Kodak's film price was 4.5 percent higher than Fuji's price in food and drug stores during a one year period, and Government witnesses also testified to price differentials between Kodak and their film. Although the price differentials may be explained in part by the fact that Kodak's competitors are deliberately undercutting Kodak's prices to obtain retail shelf space, the proof does establish that Kodak is obtaining a "premium" price for its products in some retail outlets.

There is no doubt that Kodak film enjoys a consumer preference. Kodak's own research shows that 50 percent of consumers will only buy Kodak film,[14] while another 40 percent of consumers prefer Kodak film, but are willing to purchase another brand of film. The Government argues that this strong brand loyalty "provides the foundation of [Kodak's] market power ... [consumers] pay a premium for Kodak, which they trust, rather than gamble their memories to save a few pennies." Government's Proposed Findings at 3. Thus, even the Government concedes that the preference is the result of consumer faith in a reliable product which is perceived to be superior to other films in the market.

Professor Hausman testified that premiums often arise because of actual or perceived quality differences. Tr. at 623. He opined that Kodak's price premium is not a reflection of market power, and I agree. Testimony in this case indicates, and the Government does not dispute, that consumers in general believe Kodak to be a superior film, which is why 50 percent of consumers prefer to buy only Kodak film.[15] This reputational advantage derives from Kodak's investment over the years in research and development to create and bring to market new and better quality products,[16] Tr. at 654, as well as its investment in advertising to establish brand name loyalty. Professor Hausman noted that "[p]eople who buy branded products tend to be swayed more by

---

**14.** David Biehn testified that the percentage of consumers who will only buy Kodak film has been decreasing over time.

**15.** Indeed, Professor Masson noted that "I believe that consumers think that Fuji—many consumers, the fifty percent group that we talked about—do not believe that Fuji is equal to Kodak; do not believe that any of the others are equal to Kodak." Tr. at 1487.

**16.** Professor Hausman testified that "Kodak would not have been able to stay ahead all these years without the R and D. They invented Kodacolor. They perfected it. They made many other advances as well. If they had not done this they would have fallen by the wayside in my view long ago."

**1476**

advertising and are willing to pay a higher price because they believe they're going to get a better product." Tr. at 630.

Thus, whatever reputational advantage Kodak possesses was earned through sound business practices, and there is nothing illegal about charging a premium price which consumers are willing to pay for a product which consumers believe to be superior because of a proven track record. As the Second Circuit observed in the face of a similar argument by the Government in *United States v. Waste Management, Inc.,* 743 F.2d 976, 984 (2d Cir.1984), "[w]e fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition."

To overcome this hurdle, the Government attempts to link Kodak's reputational advantage to the events of ninety years ago. In its Proposed Findings, the Government contends that "Kodak has been 'the film' in the United States ever since it monopolized the photographic supplies trade (citation omitted)." It argues further that "Kodak used the profits from its illegal monopoly to reinforce consumer perceptions of its film and otherwise maintain its monopoly position." Proposed Findings at 3. Professor Masson testified that "the acceptance of Kodak came from when we were kids [because] everything was yellow, and if everything was yellow when we were kids was because of the illegal acts they took, in some sense what we're talking about is we would like to even off the playing field." Tr. at 1454. And in response to a query from this Court to explain his position, Professor Masson testified that "we would not have this interpretation of Kodak in our minds ... had it not been for the monopoly position they had in 1954." Tr. at 1458.

The proof shows that Kodak long ago satisfied the terms of the 1921 decree through divestiture of illegally acquired businesses. There was no evidence offered to show that Kodak has since used its illegally obtained market power to exclude film manufacturers from the market. The record instead supports a finding that Kodak has been able to maintain its market position through attention to new product development and vigorous advertising thus maintaining brand loyalty. Had it not done so, as Professor Hausman testified, Kodak might have gone the way of other large multi-national corporations which have fallen on hard economic times due to market changes and new product development by competitors for which they were unprepared. Tr. at 654. Without evidence to the contrary, I decline to find that every dollar spent by Kodak to maintain its viability as a going concern is tainted by the sins of the past.

The centerpiece of the Government's argument throughout has been that "Kodak used the profits from its illegal monopoly to reinforce consumer perceptions of its film and otherwise maintain its monopoly position. Consumers' resulting long familiarity with Kodak film explains Kodak's ability to charge a premium while maintaining a high market share. Thus, Kodak's market power, initially obtained illegally, persists." Government's Proposed Findings at p. 3. No legal citation accompanies that statement nor is it supported by a factual predicate in the record. To accept the Government's argument would establish legal precedent which would allow the Government to determine what portion of a corporation's success is attached to past practices and what portion is attributed to acceptable competitive business behavior. "The decrees must remain in place, not to punish Kodak, but rather to deprive it of the market power it initially obtained illegally and to which it has no right." *Id.* at 2. To accept that argument, would allow competitors, speaking through the Government, under the aegis of the antitrust laws, to restrict competition on the theory that "once bad always bad." The Government's argument fails for want of legal precedent and lack of sufficient evidence in this record.

Moreover, the evidence clearly establishes that there is little, if any, difference in the quality of film manufactured by Kodak, Fuji, Konica, and Agfa. Kodak's competitors now manage to produce film of equal quality which is manufactured in Europe and Japan, and profitably sell it in the United States. The proof suggests that Kodak does not rely upon vestiges of the illegal profits from nine-

ty years ago to reinforce its market position, but rather that Fuji, Konica and Agfa have not advertised significantly to encourage the United States consumer to switch to their respective film brand. The automobile industry, as an example, has painfully learned that American consumers will not hesitate to purchase products manufactured outside the United States, and pay a premium for those products, if they believe the quality of the imported automobile to be of equal or greater value than their American counterparts. Thus, perceived quality differences can be changed through advertising and delivery of a dependable product.

Kodak's competitors complain, however, that increased advertising would be a waste of money because they have not obtained shelf space from retailers to justify the expense. Mr. Hudak, for example, testified that increased advertising for Fuji in the United States would be a bad investment because consumers will not be able to find Fuji film on retail shelves. Tr. at 1346. The answer, according to Fuji and the other competitors, is to continue the restrictions preventing Kodak from marketing unbranded film, otherwise the result (for them) would be "disastrous."

This explanation does not square with the proof, or with the realities of modern marketing. Mr. Hudak testified that mass merchandisers account for 45 percent of total film sales in the United States, and that K Mart, Wal Mart and Target Stores (all of which carry Fuji film) account for some 38 percent of that total just by themselves. Tr. at 1287. Eighty percent of Fuji's sales in the United States are to its top twenty accounts. Tr. at 1288.[17] Mr. Hudak admitted that Fuji sales are concentrated in large accounts, *id,* and Fuji has a twenty to forty percent market share in stores that actually carry Fuji film. Tr. at 1287.

The point, however, is that Fuji products can be found in the most aggressive and fastest growing retail establishments in the United States.[18] Thus, at least half, and probably more, of all film purchasers in this country have access to Fuji products. It therefore defies common sense to suggest that Fuji would not be able to increase its sales in mass merchandisers where it already has a strong presence, or to penetrate new outlets, by a concerted national advertising campaign with a compelling message.

As Professor Hausman testified, it is the consumer who ultimately decides what products a retailer carries, because consumers vote with their pocketbooks. A retailer who finds that enough customers are interested in purchasing Fuji film will no doubt decide to carry Fuji film. Moreover, as reported in its 1993 Annual Report, Fuji had some four billion dollars in cash and cash equivalents (up from three billion seven million dollars the year before), and it is thus clear that Fuji has the financial ability to engage in the type of advertising campaign necessary to build brand loyalty and compete more effectively with Kodak.

Consumer satisfaction today with Kodak products is related not to the events which occurred at the turn of the twentieth century, but instead to the fact that Kodak has earned consumer trust by producing a product the consumer perceives to be superior. In sum, **I find that Kodak's price premium is not evidence of market power acquired illegally, but of the perceived quality difference that exists in the minds of consumers who are satisfied with Kodak products.**

The possession of market power, which is "the power to control prices or exclude competition," *E.I. du Pont de Nemours & Co.,* 351 U.S. at 391, 76 S.Ct. at 1005 is "the primary requisite to a finding of monopolization." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d at 272, *quoting* 1 M. Handler, *Twenty-five Years of Antitrust* 691 (1973). **Having found that Kodak does not possess market power in film in either the rele-**

---

**17.** I note for the record, somewhat incredulously, that Mr. Hudak, who testified to numerous statistics, did not know what Fuji's market share was in its home country. Testimony by other witnesses revealed that Fuji enjoys a 70 percent share in Japan.

**18.** Although not a part of the record, and thus not a factor in my decision, I note that I happened to come across Fuji film in the only grocery store in Prattsburg, New York, a very small rural town in the Southern Tier of New York State, 65 miles south of Rochester, New York.

vant geographic market, or in the United States, I find that Kodak does not possess a monopoly in film manufacturing.

### 5. Section X of the 1921 Decree

Section X of the 1921 decree enjoins Kodak from selling "so-called fighting brands," and from selling film that is not labelled as having been manufactured by Kodak. In short, Kodak is prohibited from selling private label film.

Not surprisingly, Professor Hausman testified that consumers would be made better off if Kodak's application to eliminate Section X is granted. Tr. at 635. He characterized Section X as an artificial restriction to competition. Tr. at 649. He believes that if Section X is eliminated, and if Kodak enters the market for private label film, consumer choice would be increased and so would competition because Kodak would now be competing against its branded products as well. Professor Hausman and Professor Masson agreed that it is also likely that prices in the private label market would fall due to increased competition if Kodak were to enter that market. Tr. at 635; Tr. at 1541. Both the Government and 3M, the leading supplier of private label film in the United States, conceded that private label film prices act as a constraint on branded film prices. Tr. at 1050; Tr. at 1541. Professor Masson thus could not rule out the possibility that both branded film and private label film prices might go down, at least in the short run. Tr. at 1542.

Thus, even the Government's expert conceded that allowing Kodak to enter the market for private label film would benefit consumers at least in the short term. In the longer term, the Government is concerned that Kodak could drive its competitors out of the film business and raise prices to anticompetitive levels. However, significant barriers to exit the market, as testified to by Professor Hausman, and the fact that the Government could not cite one modern example of successful predatory pricing, indicate that the Government's fear is unfounded. It is now accepted that "predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita Electric In-dustrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986).

All the film in the world is produced by only five manufacturers. Each is a multi-billion dollar business entity with significant capital resources. Given the huge investment in fixed assets made by these firms, it is clear that they are committed to the market, especially the United States market. Agfa, for example, has recently invested in a 100 million dollar facility in South Carolina, where film will be split and packaged. Tr. at 1255–56. Fuji announced plans to build a major new production facility in South Carolina to manufacture color paper, estimated to cost 250 million dollars. While there was some testimony that 3M would be particularly vulnerable if Section X is eliminated, any suggestion that it will be driven out of the film market is pure speculation, and thus not a factor in my decision in this case.

But even if 3M were to decide to exit the film manufacturing business as a consequence of increased competition, consumers will nonetheless have been the beneficiaries of such competition, which will continue among the other market participants. I note that the majority of the Government's witnesses opposing Kodak's application were representatives of Kodak's competitors; not one Kodak customer took the stand to complain of Kodak's practices. I am thus drawn to the Second Circuit's admonition in *Berkey Photo* that "[w]e must always be mindful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition." 603 F.2d at 273 (citation omitted).

**I therefore find that consumer choice will be enhanced by elimination of Section X.** Moreover, elimination of Section X does not mean that Kodak will no longer be subject to the antitrust laws of this country. If Kodak or its competitors were to engage in predatory pricing, the Government may exercise its responsibility and file suit to enforce existing statutory barriers to anticompetitive behavior. **Accordingly, Kodak's application for elimination of Section X of the 1921 decree is granted.**

## 6. Section VI of the 1921 Decree

■ Section VI of the 1921 decree provides that

[f]rom and after the entry of this decree the defendants, their officers and agents, are hereby perpetually enjoined and restrained from making use of their so-called terms of sale, or any agreement in any form preventing dealers in products of the defendant corporations, or either of them, from freely selling goods produced by competitors of the defendants.

As Kodak stated in its motion for summary judgment addressed to the 1921 decree sections in issue, "Kodak has no intention of, or interest in, coercing retailers to carry only Kodak film. However, it is on occasion asked to bid or may wish to bid to become an exclusive supplier at a particular location." Motion at 20. Kodak does not believe that Section VI prevents it from supplying film under these circumstances, and in fact Kodak does so, as testimony by a representative of the Army and Air Force Exchange Service ("AAFES") established. There is no indication in the record that the Government has ever acted to prevent Kodak from obtaining exclusive supply arrangements because they are violative of Section VI. During the course of the hearing, Kodak asked the Court to eliminate Section VI in its entirety.

Testimony established that the retail film business is extremely competitive. Professor Hausman opined that any financial incentives offered to retailers would be passed on to consumers in the form of lower prices. Tr. at 650. Professor Masson also agreed that offering a favorable price to multiple retailers who are in direct competition will also result in a pass through to the consumer. Tr. at 1545.

There was testimony from only one customer who was offered an exclusive supply arrangement by Kodak. This witness, Mr. Thomas Froom, was a representative of AAFES, which operates the post exchange stores on Army and Air Force bases worldwide. His testimony established that the incentive offered to AAFES by Kodak to carry only its film went directly to AAFES's bottom line. The witness testified that AAFES's earnings are contributed to the moral, welfare, and recreation funds of the Army and the Air Force, and are used to build facilities and sponsor programs for servicemen and women. Thus, Kodak's rebates for carrying only its products were essentially passed through for the benefit of the consumer. Tr. at 1098–99.

More importantly as far as the restrictions of Section VI are concerned, Mr. Froom testified that the program offered by Kodak was voluntary; Kodak did not threaten to withhold its products or attempt to coerce AAFES in any way, and AAFES could cancel the program at any time. In contrast, a similar offer was made to and rejected by K Mart.

No evidence was offered to suggest that Kodak has harmed consumers or competition through these exclusive supply arrangements. Moreover, as with Section X, if Section VI is eliminated Kodak will still be subject to legal restrictions on exclusive dealing that apply to all competitors in the marketplace. Tr. at 1545. **I find that Kodak's exclusive supply arrangements are pro-competitive. Accordingly, Kodak's motion to eliminate the prohibitions of Section VI is granted.**

## 7. Section VII of the 1921 Decree

■ Section VII of the decree enjoins Kodak from "refusing, preventing or hindering [its] products and supplies ... from being sold freely by dealers in such goods." This provision could be interpreted to prevent Kodak from imposing non-price vertical restraints on its dealers. Non-price vertical restraints were once held to be *per se* illegal, *see United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 379, 87 S.Ct. 1856, 1865, 18 L.Ed.2d 1249 (1967). They are now judged under the "rule of reason." *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 44, 47, 59, 97 S.Ct. 2549, 2554, 2556, 2562, 53 L.Ed.2d 568 (1977) (overruling *Schwinn*).

Section VII is thus inconsistent with existing law, and its language is so broad that it could be applied to virtually any restraint which Kodak could impose on its dealers. Professor Masson acknowledged that many non-price vertical restraints are pro-competi-

tive, and thus without knowing the type of restraint which is being imposed, it is impossible to tell whether it is pro or anti-competitive. Tr. at 1546.

Although Kodak sought initially to modify Section VII to enable it to impose legal, or pro-competitive non-price vertical restraints, during the hearing it requested that Section VII be eliminated. If Section VII is eliminated, Kodak will still be subject to the antitrust laws, and thus Kodak is entitled to impose any non-price vertical restraint which does not violate the antitrust laws. **I agree with Kodak that elimination of Section VII is justified by a change in law. Therefore, Kodak's motion to eliminate Section VII is granted.**

### THE 1954 DECREE

■ Kodak maintains that the 1954 decree has outlived its usefulness in light of substantial changes in the photographic industry. Of the seventeen sections of this decree, the Government opposes terminating only Sections I, II, III, V, XVI, and XVII. Of these sections, only Section V imposes substantive restrictions on Kodak, while the remaining sections provide the procedural mechanisms for implementing the restrictive aspects of the decree. Section V is worded broadly and, in essence, prevents Kodak from connecting the sale and finishing of color film and further directs Kodak to charge separately for each aspect.

Kodak argues that continuing the ban on connecting the sale of film and photofinishing is inappropriate both in light of the radical changes in the photofinishing market, and the changes in the law since 1954.

Since 1954, photofinishing has evolved from being driven principally by availability and quality of the product, to being driven by convenience and price. The testimony during the hearing revealed that each of the three principal segments of the market—mail-order photofinishing, macrolabs, and minilabs—have different price points and different levels of convenience.

### 1. The Market in 1954

The markets for color film and color photofinishing in 1954 were indisputably controlled by Kodak. Kodak sold two brands of color film at that time: Kodachrome, a slide film, and Kodacolor, a negative film for producing prints. Kodachrome had been introduced in the late 1930s and was difficult to process because the film itself did not contain dye-forming chemicals, but only color-sensitizing chemicals. Because the dye-forming couplers for the film were added in the processing stage, Kodachrome photofinishing required a great deal of technical expertise and equipment. Kodacolor, on the other hand, put the dye-forming couplers in the film itself, simplifying the processing considerably.

In 1954, the color film market was small compared to the black and white film market. Colby Chandler, retired CEO of Kodak, who worked as a quality control engineer on the Kodacolor line, estimated that color film accounted for approximately 10 percent of overall film sales at the time, and that Kodachrome outsold Kodacolor 10-to-1 within that segment of the market. Kodak, in large part because of its technological innovation in this area, was the undisputed leader in color film manufacturing and accounted for over ninety percent of color film sales at that time.

Kodak had similar, and in some ways derivative, command over the color photofinishing sales market. Mr. Chandler estimated that Kodak finished nearly one hundred percent of its own film, and therefore controlled practically all of the color film finishing market in 1954. Because its film technicians were concerned that the introduction of non-Kodak film stocks into the Kodak process would contaminate the chemicals Kodak used in its processing, Kodak limited film processing to its own film at that time.

Kodak's monopoly in color film processing in 1954 resulted principally from the complexity of the process which it alone developed and owned. Because Kodachrome processing was technically sophisticated, it was done at macrolabs staffed by engineers who could adjust the process to ensure consistency and quality. The large fixed costs associated with establishing a Kodachrome pro-

cessing center required substantial volume to cover this overhead, and an independent photofinisher lacking a broad regional base would have found it difficult, if not impossible, to enter that market because of this barrier to entry.

Although the Kodacolor process was technologically simpler and less expensive to duplicate, Kodacolor film was being refined in 1954, and processing required a great deal of technical support as subtle refinements were made to the film and the processing. Colby Chandler, for example, testified that adjustments to the film were being made on almost a daily basis. Tr. at 96.

Color film and processing were thus linked in a technological sense, and Kodak chose to link their marketing as well. A customer wishing to take color pictures would purchase film with the processing cost included. The customer would then expose the film, place it in a mailer, note any finishing preferences, and send it to a Kodak lab for photofinishing. The prints would then be returned to the customer in two to three weeks.

This tying of film and photofinishing, when combined with Kodak's significant technological advantages in both color film and finishing, also made it possible for Kodak to achieve near-monopoly in both film and processing. As a result, Kodak did not even have enough competition to provide a benchmark for its pricing. As Mr. Chandler testified, the basis of Kodak's pricing scheme at the time was cost-plus-profit, because Kodak could not measure its prices against those of any significant competitors. Tr. at 98.

### 2. The 1954 Decree and Its Effects

The 1954 decree was intended to remedy Kodak's near-monopoly in the color film processing market. Section V provided part of the means to accomplish this by preventing Kodak from selling film with processing costs included. The key to accomplishing the goal of active competition in the photofinishing

market, however, was provided in Sections VI through XIII of the decree. These provisions, for which the Government has not opposed termination, required that Kodak actively assist persons or companies wishing to enter the color film processing market. These sections demonstrate the main purpose of the decree, which was to end Kodak's huge technological advantage in color film processing and create a market where there had been none before.

Sections VI through XIII provide a clear path toward accomplishing the goal of eliminating Kodak's technological stronghold in 1954. Section VI required Kodak to grant licenses on a non-discriminatory basis and for reasonable royalties for *all* of its color photofinishing processes and machinery. Section VII required Kodak to provide detailed manuals describing the color photofinishing processes to any person with a bona fide desire to enter into the photofinishing business and willing to pay a $100 fee. (Colby Chandler estimated that the three manuals which were provided explaining the Kodacolor process, when stacked on top of one another, were approximately a foot high. Tr. at 105.) Section VIII required Kodak to send a technical advisor to the plants of competitors to provide technical assistance, and to allow potential competitors to tour Kodak's plants up to four times per year. Section IX directed Kodak to provide all plans and specifications for the machines Kodak used to process color film so that competitors could construct similar machines. Section X required Kodak to offer Ektachrome brand slide film for sale in all film sizes in which it offered Kodachrome.[19] Section XI required that Kodak make available all necessary chemicals and supplies for photofinishing. Section XII required Kodak to divest itself of processing capacity if it could not show, seven years after the entry of the decree, that the changes mandated above had produced substantial competition in the photofinishing market. Finally, Section XIII required Ko-

---

**19.** Ektachrome was a slide film, like Kodachrome. It differed from Kodachrome in that the film itself contained dye-forming couplers, which simplified the film processing. As mentioned above, the technological difficulty of processing Kodachrome limited competition for

photofinishing. Ektachrome was introduced to provide an alternative slide film which could be processed by third parties who would compete against one another and against Kodak for processing.

dak to make a public announcement of the above changes.

Placed in the context of the other changes, Section V was important to the decree, but did not constitute the decree's main purpose. Section V was necessary in 1954 because the creation of the photofinishing market through the dismantling of Kodak's technological advantage would not have been possible were Kodak color film—then the overwhelming market leader in both quality and market share—sold with processing included. The industry which the decree sought to create would have been stillborn because consumers would be unwilling to pay for processing twice.

Without question, the goals of the 1954 decree were achieved. The creation of the market brought about by the 1954 decree opened up what one witness called "a period of just enormous growth and profitability" in the color photofinishing market. Tr. at 131. Competitors desiring to enter the color processing market could purchase the manuals and plans for a minimal investment and determine whether conversion of their existing facilities or building new facilities was technically and financially feasible. If they did decide to enter the market, they would be brought up to speed relatively quickly through Kodak's technical assistance. Donald Becker, who operated Stanley Photo Service at the time of the 1954 decree, stated that within two to three years, the competition in the market was beginning to get up to speed with Kodak. Tr. at 134. As more competitors got into the market, processing time was dramatically reduced and price steadily decreased. The quality of the third-party developers increased as well, albeit at a slower rate—Colby Chandler testified that by the late 1960s to early 1970s, the quality of some third-party photofinishers was beginning to equal that of Kodak's own labs, which had provided the benchmark for quality up to that time. Tr. at 108–09.

### 3. The Market in 1994

Although the photofinishing market today contains similar options to those available in 1954—mail-order finishing and finishing by macrolabs—it is now affected by the emer-

gence of a very significant alternative—the minilab. Minilabs, introduced into the United States in the early 1980s, would provide two important benefits to the market during the next decade. First, it provided a convenient option to consumers that had previously been technologically impossible. Customers could receive finished photos *in an hour*, instead of waiting at least overnight for processing by a macrolab.

Second, minilabs were available for purchase at a price point of as low as $40,000 for a new machine, and substantially less for a used machine. Kodak Exhibit 9, Tr. at 203–204. This dramatically reduced the barriers to entry into the photofinishing market. While opening a macrolab involved an initial capital investment of $2 million or more and required a network of retail outlets as intake points, a camera shop operator or an entrepreneur could purchase a minilab and set it up for far less than one-fortieth of that cost and operate it at virtually any retail location. Moreover, retail outlets, such as grocery stores and discount stores, could offer the convenience of a minilab to their customers for a relatively minimal expense. The ease of entry into this market is reflected by the explosion of minilabs in the last 14 years. Nearly 22,000 minilabs were operating in the United States in 1992, with the rate of new installations ranging from 1,000 to 2,000 minilabs per year in the late 1980s and 1990s.

The addition of minilabs to the market has created more options for the consumer. These options involve trade-offs between time, convenience, and price. The customer seeking the lowest price, and willing to sacrifice the time required to receive prints, might choose a mail-order photofinisher. These photofinishers, which by their nature have a national presence as close as the consumer's mailbox, benefit by having low retail overhead and can offer a competitive price on that basis. The mail-order finisher can provide price and convenience benefits, but cannot provide the overnight service that most macrolabs offer as a standard service, much less the one-hour service offered by minilabs.

At the other end of the market, the customer willing to pay more for speed and

convenience may choose a minilab, which is the fastest-growing segment of the photofinishing market. The testimony and exhibits presented at trial demonstrated that minilabs can process approximately 50–60 rolls an hour. Although a minilab generally entails greater retail overhead and because people are willing to pay a little more for speed, minilab prices are often a little higher than those of macrolab outlets and generally significantly higher than mail-order prices.

Between these two extremes is the macrolab market. Macrolabs generally operate behind a retail outlet, whether a chain of developing stores or specialty camera shops (such as Wolf Camera), a drugstore chain (such as Walgreens or CVS), a grocery store chain (such as Wegmans) or a large discounter (such as K Mart). Using these stores as intake and distribution points, wholesale macrolabs provide photofinishing services to a large number of outlets, usually within a certain geographic area. In addition, so-called "captive" macrolabs are owned and operated by a retail chain and service all of its outlets in a region. In general, the convenience, time, and cost of the service provided by the macrolabs falls between that provided by mail order and that provided by a minilab operator. Macrolabs cannot provide the one-hour service of a minilab, but they have evolved toward an industry standard of "next-day-or-free" premium service and a three-day "normal" service, but at a price lower than the minilab.

Although the particular features of these three types of services differ, it is clear that they compete directly with one another. Scott Sims, the president of Scott's Photo of Rochester, testified that he competes for customers with every photofinishing distribution point in his area, including other minilabs within a few miles of his store, retail outlets located across the street from his store, other retail outlets within the Rochester area, and mail order business. He also testified that, although his price for one-hour developing has remained stable, he has had to use promotions and coupons to increase his business, which effectively lowers the price to many customers. Moreover, he testified on cross-examination that he often checks the prices of local stores to make sure that his prices were in-line with theirs. Neil Cohen, the president of District Photo, a mail-order photofinisher, testified that his business competes for customers with essentially every retail distribution point nationwide.

The extent of this competition is reflected in proof offered by Kodak (Exhibit 13), which demonstrates that wholesale macrolabs and mail-order macrolabs have steadily decreased in market share of the photofinishing market between 1986 and 1992, while minilabs and "captive" macrolabs have expanded their market shares over the same period of time. In 1986, wholesale macrolabs controlled 45 percent of the market, while minilabs had 25 percent. By 1992, the market share of minilabs had grown to 36 percent, while wholesale macrolabs had shrunk to 36 percent. Over the same time period, the market share of mail order macrolabs had diminished from 21 percent to 7 percent and the share of captive macrolabs had grown slightly from 17 percent to 21 percent.

Moreover, Kodak Exhibit 12 portrays the broad distribution of retail minilabs across the United States. No state had less than 30 labs, and many had hundreds—California alone had 2,690 minilab outlets. The exhibit demonstrates dramatically that there are very few, if any, areas of the United States not serviced by minilabs. This competition, in addition to that of mail-order and macrolabs, provides almost any customer with a choice of photofinishing services, and indicates that the 1954 decree has been profoundly successful in not only stimulating a competitive photofinishing market, but creating a new industry in minilab processing alone.

### KODAK'S REQUEST TO TERMINATE

#### 1. The Relevant Product Market

█ With the present condition of the market thus described, the relevant product market must be defined. As previously noted, defining the relevant product market begins with the principles of *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). In *du Pont*, the court conceded that the deter-

mination of the relevant market was fact-intensive, and set forth the general principle that "no more definite rule can be declared than that commodities reasonably inter-changeable by consumers for the same purposes make up [the relevant product market]." As the court analyzed the particular facts of the market, it held that "[i]n determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control." *Id.*, 351 U.S. at 395, 76 S.Ct. at 1008. The Court held that "cellophane's interchangeability with the other materials mentioned suffices to make it a part of this flexible packaging material market." *Id.*, 351 U.S. at 400, 76 S.Ct. at 1010.

The evidence demonstrates that the product market for photofinishing includes mail-order photofinishers, macrolabs, and mini-labs. The photofinishing from each is "reasonably interchangeable," in part because the end product—a finished print with quality acceptable to the average consumer—is the same in each case. Herbert Keppler, the publishing director of *Popular Photography* magazine, compared the quality of various photofinishing options. He noted that print quality varies across the spectrum of photofinishing (for example, two prints from the same Qualex wholesale lab were vastly different in print quality), but his testimony did not indicate that there was any significant overall quality difference between the various photofinishing options. He testified that the highest quality print in Kodak Exhibit 18, a series of similar photographs processed by different photofinishers, was produced by a minilab, outshining even a print processed by hand by a custom photofinisher. Tr. at 268–275.

Similarly, although minor price gradations among mail-order, wholesale macrolabs, and minilabs exist, even this price continuum has limits and points of overlap. For example, Scott Sims testified that his price for "normal processing" of film was $10.19 for a 24–exposure roll on same-day service, and one dollar more for one-hour service. He also pointed out, however, that he issues coupons for $2 off his processing, many of which are redeemed. This promotion lowers his effective price to even below $10.19. This price was comparable to the prices that the Government offered on various retail outlets for macrolab photofinishers in proximity to Scott's Photo, which ranged between $6.49 and $8.49 for overnight service.

The relevant product market, therefore, encompasses all photofinishing because each photofinishing option is an acceptable substitute for another. The differences among the options—which amount principally to the time required to turn around processed film for processing—do not prevent each from competing with one another.

Each option provides a check on the others. If a macrolab finisher attempted to raise prices above the monopoly level in a particular area, the retail consumers would still have the option of taking their film to a minilab, which could (in order to accept the increased business) provide same-day or overnight service for a lower price than their one-hour service. Even if there were no minilabs in that area at that time, an entrepreneur or minilab chain could have a minilab installed in a short time for a minimal capital investment. On the wholesale level, the increased price could attract a competing macrolab to build a plant in that area within six to nine months. Finally, the consumer would always have the option of sending prints to a mail-order finisher and receiving them in a week or so.

Similarly, if the only minilab in a particular area decided to raise its prices for one-hour service, macrolabs serving that area would gain more overnight business from customers who had time-sensitive photographs, but were unwilling to pay an excessive premium for one-hour service.

Macrolabs also compete on two levels. Thomas Fitzgerald, the CEO of Qualex, testified that Qualex competed on a wholesale level for accounts with retail stores, and that Qualex also indirectly competed on a retail level with outlets that are serviced by other labs. Qualex, therefore, must not only outbid competing macrolabs for retail accounts, but remains under pressure from those retail outlets to keep its wholesale prices down so that the retail accounts can remain competitive. Fitzgerald testified that whether a roll of film is lost at the wholesale level or the

retail level does not matter from the perspective of Qualex. That business is simply lost. Tr. at 294.

**Because all segments of the photofinishing market have the potential to take business away from one another and do, in fact, compete, I find that the relevant product market consists of all photofinishing.**

### 2. The Relevant Geographic Market

▪ The Supreme Court, in *Brown Shoe Co. v. United States,* 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962), set forth the considerations necessary to determine the relevant geographic market in the context of a Clayton Act § 7 case:

> Moreover, just as a product submarket may have § 7 significance as the proper "line of commerce," so may a geographic submarket be considered the appropriate "section of the country".... Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both "correspond to the commercial realities" of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.

*Id.* Although *Brown Shoe* involved Clayton § 7 merger analysis, its principles apply no less forcefully to Sherman Act cases. *See United States v. Grinnell Corp.,* 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

▪ For reasons discussed above, the "commercial realities" of the photofinishing market establish that the market is the United States. Although a particular macrolab might conduct business within a particular geographic region involving one to several states, and minilabs generally conduct business within a particular region, the overall market is national in scope. Both Fuji Tru-Color and Qualex labs conduct business on a national level, and promote themselves as national photofinishers. Konica Quality Photo Labs have a strong regional presence in the northeast, west coast, and midwest regions and have demonstrated the capacity to enter new markets within the United States, having opened new labs in Honolulu, Hawaii, Richmond, Virginia, and Maryville, Indiana since 1992. Minilab chains, such as Moto-Photo and Ritz Camera, also have a broad national presence through their franchising agreements and national promotion and advertising. Finally, mail-order photofinishers, such as Clark Photo and District Color Labs, have a national presence due to the nature of their business and have customers in all 50 states. Independent minilabs and macrolabs are also a component of the market. While these independent labs are local and regional, rather than national, they serve as local competitors to a primarily national business.

Moreover, macrolab operators, such as Fuji and Qualex, compete for accounts with national chains of retailers on a regional or national basis. The three main providers of such services are businesses of national scope. They compete not only among themselves, but with actual and potential competition from "captive" macrolabs. Wal Mart, for example, operates five macrolabs which service Wal Mart stores in a given geographic area. In other areas, Wal Mart contracts with a wholesale photofinisher. The three wholesale labs, therefore, demonstrate Wal Mart's ability to build and provide its own photofinishing services.

In *United States v. Grinnell Corp.,* the Supreme Court upheld the District Court's finding that the geographic market for central-station security alarm services is national, stating:

> As the District Court found, the relevant market for determining whether the defendants have monopoly power is not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business.

*Id.,* 384 U.S. at 575–76, 86 S.Ct. at 1706 (1966). Similarly, in *American Football League v. National Football League,* 323 F.2d 124, 130 (4th Cir.1963), the Fourth Circuit upheld the district court's finding that

the relevant market for football was the United States, rather than the thirty-one individual cities believed to have sufficient population to make professional football desirable and profitable. The market here is similar to that in *Grinnell.* Time constraints and transportation costs necessarily limit the effective radius of any particular macrolab to a few hundred miles, and minilabs service an even smaller retail radius. The base of the market, *i.e.* the national network of macrolabs run by Qualex, Fuji, and Konica, the national chains of minilabs, the national retail clients served by macrolabs, and the national service provided by mail order photofinishers, operates within the United States market.

**For these reasons, I find that the relevant geographical market for photofinishing is the United States.**

### 3. Qualex's Market Power in Photofinishing

The Government does not contend that Kodak itself has any market power in photofinishing. It does contend that Qualex, an independent corporation in which Kodak has a 49 percent equity stake, is dominated by Kodak and could, because of corporate structuring agreements, at any time take over total control of Qualex. Thomas Fitzgerald, President of Qualex, estimated that Qualex controls less than 30 percent of the total United States photofinishing market. The Government offered no proof to the contrary. This national market is the relevant market and even a 30 percent share does not give Qualex monopoly power. *See Broadway Delivery Corp. v. United Parcel Service, Inc.,* 651 F.2d 122, 128 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (It may even be possible to determine that a defendant lacks monopoly power *as a matter of law* "if the defendant's share is less than 50 percent, or even somewhat above that figure, and *the record contains no significant evidence concerning the market structure to show that the defendant's share of the market gives it monopoly power."*) (emphasis supplied); *see also United States v. Aluminum Company of America,* 148 F.2d 416, 424 (2d Cir.1945) ("[c]ertainly, thirty-three percent [share of the relevant mar-

ket] is not [sufficient to constitute a monopoly].").

Even Professor Masson, while maintaining that Qualex had "some degree" of market power, described the market for photofinishing as "reasonably competitive" and "workably competitive" in its current state, and stated that Qualex probably did not possess what courts would call monopoly power. (Tr. at 1512.)

Moreover, because there are no practical barriers to entry in the photofinishing market, Qualex could not profitably raise its prices above competitive levels without having retail customers turn to mail-order photofinishing, minilabs, or other macrolabs as alternatives. Similarly, Qualex has no power to exclude competition or control prices in the market because of the low barriers to entry into the photofinishing market. *See United States v. Baker Hughes, Inc.,* 908 F.2d 981, 987 (D.C.Cir.1990) ("In the absence of significant barriers [to entry], a company probably cannot maintain supra competitive pricing for any length of time."); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 366 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) ("A high market share, though it may ordinarily raise an inference of monopoly power, ... will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.").

### 4. Kodak's Ability to Tie Film and Photofinishing

Section V(4) of the 1954 decree explicitly forbids Kodak from "[t]ying or otherwise connecting in any manner the sale of its color film to the processing thereof, or the processing of its color film to the sale thereof."

■■■ Kodak has represented that it does not seek to "tie" film and photofinishing. Tying involves "an agreement by a party to sell one product, but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514,

518, 2 L.Ed.2d 545 (1958). The key difference between tying and bundling is that tying involves the conditioning of the sale of one product on the purchase of the other. *Id.* 356 U.S. at 6, n. 4, 78 S.Ct. at 518, n. 4 ("[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price.")

While tying arrangements can be illegal under the antitrust laws, "bundling" or "package sales" are generally considered to be pro-competitive. *See Jefferson Parish Hosp. District No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984) ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act.").

Given the competitive nature of both the photofinishing industry and the photographic film industry, bundling of film and photofinishing might provide a method by which Kodak can compete to offer useful products. Kodak's witnesses identified products that Kodak would be able to offer, including single-use cameras with processing included, coupons on photofinishing, or replacement Kodak film as part of a bundle. These bundles would offer a greater range of choices to consumers and would increase competition, because Fuji and Konica could offer similar products or, optionally, offer "unbundled" versions of products for the consumers who do not wish to purchase in a package.

The issue here is whether Kodak may engage in forms of bundling which *do not* violate the antitrust laws. Because of the changes in the photofinishing market, the potential benefits to the public resulting from increased competition, and the pro-competitive nature of bundling, I hold that they should be permitted to do so.

**5. The Potential for Kodak to Leverage**

█ The Government also contends that lifting the 1954 decree would allow Kodak to use its "market power" in film to place its wholesale photofinishing competitors—principally Fuji and Konica—at a disadvantage and ultimately to charge higher prices to consum-

ers and violate § 2 of the Sherman Act. This argument was recognized in *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). That section of *Berkey* was acknowledged as dictum in *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990), however, and has been criticized and rejected by courts in other circuits. *See, e.g., Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992) ("We believe that *Berkey Photo* misapplied the elements of Section 2 by concluding that a firm violates Section 2 merely by obtaining a competitive advantage in the second market, even in the absence of an attempt to monopolize the leveraged market.").

Even if such an argument were available, I have held that Kodak does not have market power with respect to film, and therefore could not leverage into the photofinishing market. Finally, even if Kodak were to have market power in the film market, because of the ease of entry into the photofinishing market, any attempt to monopolize that market would be a pyrrhic victory because competitors would re-emerge quickly and restore competitive balance. *See, e.g., Oahu Gas,* 838 F.2d at 366.

█ The Government's final, and most speculative, argument with respect to leveraging is that Kodak will come to dominate the photofinishing market and then use that power to discriminate against non-Kodak film by processing it poorly, thus causing consumers to unfairly place the blame on the film. The argument is without merit. Speculation about potential illegal acts, where there is no evidence that these acts have occurred in the past, cannot be a basis for denying termination of the 1954 decree when the essential purpose of the decree has been met.

### CONCLUSION

Kodak has met its burden of demonstrating both that the essential purposes of the 1921 and 1954 decrees have been met and also that changes in the film and photofinish-

ing industries since the decrees were entered have made the decrees obsolete. The divestitures mandated by the 1921 decree have long since been accomplished, and Kodak now finds itself competing in a world market against other multinational, billion dollar film manufacturers. Kodak no longer has market power in film because of the advent of worldwide competitors equal to Kodak in size and financial strength. Because the purpose of the 1921 decree has been achieved, equity demands that the artificial restraints to competition which the decree continues to impose on the marketplace be lifted.

The 1954 decree served an important purpose—it created a competitive color photofinishing industry where there had been none—but because its purpose has been achieved, equity also demands that its terms not restrict further innovation and competition in the industry. Moreover, the photofinishing industry has changed radically since 1954, particularly with the advent of minilab and microlab technology, which has dramatically lowered the barriers to market entry and increased competition. Any danger that Kodak could dominate the industry and raise prices above competitive levels has long passed. It is simply a different world and a different market.

Put simply, the 1921 and 1954 decrees are outdated in the present market and must be set aside. I therefore hold that Kodak has met its burden under *Rufo* and has demonstrated that "a significant change in circumstances warrants revision of the decree." *Rufo,* —— U.S. at ——, 112 S.Ct. at 760. **Accordingly, Kodak's application for relief from the 1921 and 1954 decrees is granted, and the decrees are set aside and terminated.**

ALL OF THE ABOVE IS SO ORDERED.